# BROWN, et al. v U. S. NAVAL AIR STATION and DEPARTMENT OF ENVIRONMENTAL REGULATION

## Case No. 86-2880

State of Florida, Division of Administrative Hearings

August 19, 1987.

### APPEARANCES OF COUNSEL

**Mary M. Callaway** for petitioners.

**Robert Boasberg, Jr.,** Commander, JAGC, U.S. Navy, Staff Judge Advocate, for respondent, U. S. Naval Air Station.

**Karen Brodeen,** Assistant General Counsel and **Douglas Wyckoff,** Assistant General Counsel, for respondent, Department of Environmental Regulation.

### OPINION OF THE COURT

LARRY J. SARTIN, Hearing Officer.

### RECOMMENDED ORDER

Pursuant to written notice a formal hearing was held in this case

before Larry J. Sartin, a duly designated Hearing Officer of the Division of Administrative Hearings, on February 27, 1987 and June 17-18, 1987, in Pensacola, Florida.

## PROCEDURAL STATEMENT

The United States Naval Air Station in Pensacola, Florida (hereinafter referred to as the "Navy"), filed an application with the Department of Environmental Regulation (hereinafter referred to as the "Department"), for a dredge and fill permit to construct an extension to an existing breakwater in the vicinity of Bayou Grande and Pensacola Bay. The Department executed an Intent to Issue the requested permit. The Petitioners, J. D. Brown and the Bream Fishermen's Association requested an administrative hearing to contest the proposed permit approval.

The Petitioners' request for hearing was assigned case number 86-2880 and was initially assigned to P. Michael Ruff. The case was subsequently assigned to the undersigned.

At the final hearing the Department presented the testimony of the following individuals who were accepted as experts in the fields noted:

| Name | Expertise |
|------|-----------|
| Dr. Kenneth Exchternacht | Meteorology, physical oceanography, hydrographic engineering and the effect on water quality. |
| Charles Harp | Analysis and processing of Department dredge and fill permits, the effect of dredge and fill projects on plant and animal life and water quality, and navigation. |

The Department also offered 6 exhibits which were marked as "DER" exhibits and accepted into evidence.

The Navy presented the testimony of John Foot, Jose Maniwane, and Duane Sparby. The Navy offered 3 exhibits which were marked as "NAS" exhibits and accepted into evidence.

The Petitioners presented the testimony of Neil McMillan, Jr., Dr. Robert M. Ingle, Dr. Robert M. Sheely, Norman Paul Autin, J. B. Davidson, Dr. Richard G. Olsen, J.D. Brown, Ronald McAfee and Mrs. John Hanan, II. Dr. Ingle was accepted as an expert in marine biology, Dr. Sheely was accepted as an expert in environmental science and Dr. Olsen was accepted as an expert in bio-medical engineering and the environment. The Petitioners offered 14 exhibits into evidence.

All of the Petitioners' exhibits, including 6 that were not offered into evidence, were marked as "BFA" exhibits. BFA exhibits 7-10, 12-13, and 15 were accepted into evidence. BFA exhibits 1-4 and 5-6 were not offered into evidence. A ruling on BFA exhibit 4A was reserved. That exhibit is hereby rejected. BFA exhibits 11, 14, and 18-19 were rejected. Finally, BFA exhibits 16 and 17 were accepted for illustrative purposes only.

In addition to the witnesses called by the parties, 3 public witnesses testified: S. A. Terrebone, Lawrence Russo and Richard T. Radford. One exhibit, "Public Witness #1" was received.

Following the conclusion of the final hearing, the Department filed a Motion to Strike Petitioners' Review of Testimony and Summary of Closing Statement. The Petitioners filed an Answer to Motion to Strike in which the Petitioners requested an assessment against the Department of costs associated with preparing and filing the Answer. Although the Petitioners have filed a document titled "Petitioner's Review of Testimony and Summary of Closing Statement" in addition to documents titled "Proposed Findings of Fact" and "Proposed Conclusions of Law," the Petitioners have in effect simplyfiled a proposed recommended order or brief as authorized by law. Therefore, the Department's Motion to Strike is denied. The Petitioners' request for costs is also denied.

The parties have filed proposed findings of fact. A ruling on each proposed finding of fact has been made either directly or indirectly in this Recommended Order or the proposed finding of fact has been accepted or rejected in the Appendix which is attached hereto.

## ISSUE

Whether the Department should issue a dredge and fill permit to the Navy to construct an extension to an existing breakwater in the vicinity of Bayou Grande and Pensacola Bay?

## FINDINGS OF FACT

A. *The Parties.*

1. The Department is the agency responsible for the issuance of dredge and fill permits in the waters and wetlands of the State of Florida.

2. The Navy is an applicant for the subject dredge and fill permit.

3. The parties have standing to participate in this proceeding.

B. *The Application and its Review.*

4. On June 12, 1985, the Department received a dredge and fill application from the Navy requesting a permit for the construction of an 850-foot extension of a breakwater in the vicinity of Bayou Grande and Pensacola Bay. The application was received by the Northwest Florida district office of the Department.

5. The Navy filed its application on DER form 17-1.203(1).

6. In a letter dated January 20, 1986, to the Jacksonville District, Corps of Engineers, the Bream Fishermen Association (hereinafter referred to as the "BFA"), raised several issues they believed needed to be addressed concerning the proposed project: (1) The effect on safety; (2) the effect of the existing breakwater on submerged grasses; and (3) pollution in Bayou Grande.

7. In a letter dated January 28, 1986, to the Northwest Florida district office of the Department the BFA again expressed their concerns about the proposed project.

8. In response to the BFA's letter of January 28, 1986, the Department asked Dr. Kenneth Exchternacht, the Department's hydrographic engineer, to evaluate the proposed project. In a memorandum dated February 20, 1986, Dr. Exchternacht requested that the Navy provide the following additional information:

1. Provide documentation and [sic] to the tidal flow direction and amplitude in Pensacola Bay south of the proposed work area and north of the mouth to Bayou Grande for both ebb and flood. Mean current speeds and trajectories as well as maximum midtide velocites are needed.

2. Provide estimates of the net littoral drift direction and volume to the north of the mouth of Bayou Grande and to the south of the work area along Magazine Point.

9. The Navy performed the additional hydrographic survey requested by the Department and submitted the information to the Department.

10. The submission of the hydrographic survey requested by the Department completed the application for the extension of the breakwater.

11. The application submitted by the Navy was a "short-form" application. It was promptly filed with the Department's district office.

12. The proposed project does not involve in excess of 10,000 cubic yards of material to be placed in the waters of the State.

13. The completed application involved in this proceeding was not received prior to October 1, 1984.

14. The application as submitted by the Navy complied with the requirements of the applicable Florida Statutes and the Department's rules.

15. The Department completed its Permit Application Appraisal on May 14, 1986 and issued an Intent to Issue with regard to the Navy's proposed project on June 4, 1986.

16. The Petitioners timely filed a petition for administrative hearing challenging the Department's proposed intent to issue the permit requested by the Navy.

C. *The Proposed Project.*

17. The Navy has proposed a permanent extension of an existing breakwater by 850 feet. The existing breakwater was constructed in 1966. No dredge and fill permit was required by the Department or any other agency when the existing breakwater was constructed.

18. A channel exists at the site of the existing breakwater. It runs parallel to the breakwater on its southward side. The channel has been in place since the mid-1940's.

19. The proposed extension of the breakwater will consist of approximately 7,650 cubic yards of concrete rubble. It will cover an area of 1.12 acres. It is properly and adequately designed.

20. As originally filed, the Navy's application reflected that the location of the breakwater was 30° 21′ 23″ Latitude and 87° 15′ 33″ Longitude. This is not the correct location of the breakwater. The correct coordinates of the breakwater and the proposed extension are 30° 22′ 25″ N Latitude and 87° 15′ 45″ W Longitude. The correction location of the project was discernable from other information in the application.

21. The breakwater is located at the entrance from Pensacola Bay to Bayou Grande at a promontory of land known as "Magazine Point".

22. The existing channel and breakwater and the proposed extension run east and west with Pensacola Bay on the east and Bayou Grande on the west.

D. *Water Quality Standards.*

23. Bayou Grande and Pensacola Bay are Class III waters.

24. The project will not degrade the existing water quality in Bayou Grande or Penscola Bay or in any way increase the introduction of pollutants into Bayou Grande.

25. Tidal waters exit Bayou Grande during ebb tide flow. They also exit Bayou Chico to the north at approximately the same time. The

project will, therefore, not have a significant funneling effect allowing an increased of polluted water from Bayou Chico or any other area into Bayou Grande.

26. The proposed project will serve to stabilize the volume exchange of water between Bayou Grande and Pensacola Bay.

27. The size of the existing breakwater and the proposed extension will have no measurable effect on the circulation of waters in Pensacola Bay The circulation of Pensacola Bay is controlled primarily by tide flow and secondarily by the wind. The tidal cycle of Pensacola Bay is 24.8 hours. The ebb tide, combined with the Coriolis effect, causes the water flow to hug the left or northwest bank of Pensacola Bay as it ebbs sought toward the Gulf of Mexico.

28. The hydrographic study information provided by the Navy to the Department was sufficient to indicate that the general circulation of Pensacola Bay will not be significantly affected by the project.

29. A hydrographic study of a bay could include numerous sampling stations collecting data over a significant period of time. Such an extensive study is not necessary or available in this proceeding. An adequate hydrographic study was submitted by the Navy to the Department. The study was conducted as requested by the Department.

30. Based upon the hydrographic study performed by the Navy and other available information, the proposed project will not adversely affect circulation patterns in Bayou Grande or Pensacola Bay to an extent necessary to require a more comprehensive study.

31. Any degradation in the water quality of Bayou Grande is and has been due to runoff from developed area around the shoreline of the bayou.

32. It is not clear what types of seagrasses have existed in Bayou Grande historically or are in existence today. Seagrasses that have existed or do exist in Bayou Grande include thallassia testidinium (turtle grass), halodule wrighti (cuban shoalweed) and ruppia maritima (widgeon grass). Turtle grass and cuban shoalweed thrive in water with a high salinity concentration. Widgeon grass prefers a lower salinity concentration.

33. Historically, seagrasses have increased and decreased in coverage of Bayou Grande. The cause or causes of the fluctuations in the coverage of seagrasses in Bayou Grande is unknown. The evidence failed to prove that the existing breakwater has had, or that the proposed project will have, any effect on seagrasses in Bayou Grande.

237

34. No studies have been conducted in the proposed project area which identify seagrasses, the extent of their growth, the effect of salinity on existing seagrasses or any causal connection between the existing breakwater or its proposed extension and the decline or increase of seagrasses.

35. Based upon all of the evidence the proposed project should not adversely effect the salinity concentration in Bayou Grande or any seagrasses in the vicinity.

36. With the development around Bayou Grande, if the channel were allowed to close, it is likely that the water of Bayou Grande would become extremely poor.

E. *The Public Interest.*

37. The area to be filled is shallow, bare, sandy bay bottom. There are no sea grasses in the area that will be covered by fill.

38. The existing biological community of the area to be filled is of relatively low diversity. Only a very small number of organisms may be buried during construction of the breakwater extension.

39. The area of the project is a high wave action area. The biological community of the immediate area of the breakwater extension is a waved stressed community. The area is not a coral reef or shellfish producing area.

40. There are no identified endangered species located in the area of the project or Bayou Grande.

41. The burial of any organisms will be offset by the colonization of algae and other fouling community organisms. Algae is important to the food chain by providing food to higher level organisms. The expected fouling communit will be more productive and diverse than the existing sandy bottom community.

42. Bayou Grande is an estuary and serves as a nursery for a wide variety of marine life and aquatic birds. In the distant past, marine life in Bayou Grande thrived. In the past 40 to 50 years there has been a decline in marine life in Bayou Grande. During the past 4 to 5 years Bayou Grande has improved as a nursery estuary. The evidence failed to prove that the breakwater directly affected the nursery function of Bayou Grande.

43. The nursery function of Bayou Grande will not be adversely affected by the proposed project.

44. The extension of the breakwater will not cause a safety hazard.

238

45. The project will have a positive effect on navigation by contributing to keeping the channel open for use by boats.

46. The water at the end of the existing breakwater is 1.7 feet deep. The depth of the water will increase to 5.9 feet at 800 feet of the proposed extension and to 10 feet at the end of the 850 feet of the proposed extension.

47. An experienced boat operator should have little difficulty in avoiding the breakwater. The channel entrance is marked with a day marker and there is a light in the middle of the breakwater.

48. Extension of the breakwater will help prevent boats from running aground on the shallow sandy bottom. The extension will also provide protection for small vessels seeking protection from storms. The extension will provide a windbreak from southern winds and enable vessels to more easily reach the shelter of Bayou Grande.

49. On the November of October 19, 1986, a speedboat ran into the existing breakwater. According to a passenger on the boat, the light of the breakwater was not visible.

50. The proposed project will not cause any harmful erosion or shoaling. The project will prevent shoaling by acting as a permeable barrier to natural sand transport. This will in turn help to keep the channel open and minimize dredging operations.

51. The channel has been subject to repeated dredings to maintain the channel. The last dredging took place in 1982.

52. Bayou Grande is used for recreational purposes, including fishing and boating.

53. The proposed project will not adversely affect the fishing and boating activities in Bayou Grande.

54. The proposed project will not adversely affect any significant historical or archaeological resources.

55. The Navy has been granted a permit as of January 3, 1986, to expand its marina facilities in an area adjacent to Bayou Grande. Access to the marina from Pensacola Bay is through the channel at Magazine Point.

56. The proposed project will not adversely affect water quaity standards or the public interest, even considering the permit granted to the Navy for the expansion of its marina facilities.

## CONCLUSIONS OF LAW

The Division of Administrative Hearings has jurisdiction of the

239

subject matter of, and the parties to, this proceeding. Section 120.57(1), Florida Statutes (1986 Supp.).

Section 403.913(1), Florida Statutes (1985), requires that any prson who wishes to dredge or fill in, on, or over the surface waters of the State of Florida must obtain a permit from the Department, unless otherwise exempted. Section 403.918, Florida Statutes (185), provides the criteria which must be met in order for the Department to grant a permit to dredge or fill.

Pursuant to Sections 403.918(1) and (2), Florida Statutes (1985), a permit may be issued only if the applicant provides the Department with reasonable assurances that water quality standards will not be violated by the project and that the project is not contrary to the public interest. In determining whether a project is contrary to the public interest, the Department is required to consider and balance the following criteria:

1. Whether the project will adversely affect the public health, safety, or welfare or the property of others;

2. Whether the project will adversely affect the conservation of fish and wildlife, including endangered or threatened species, or their habitats;

3. Whether the project will adversely affect navigation or the flow of water or cause harmful erosion or shoaling;

4. Whether the project will adversely affect the fishing or recreational values or marine productivity in the vicinity of the project;

5. Whether the project will be of a temporary or permanent nature;

6. Whether the project will adversely affect or will enhance significant historical and archaeological resources under the provisions of § 267.061; and

7. The current condition and relative value of functions being performed by areas affected by the proposed activity.

Rule 17-12.060 and 17-12.290, Florida Administrative Code, provide the procedures for obtaining a dredge and fill permit. Pursuant to Rule 17-12.090, Florida Administrative Code, an application must be made on Form 17-1.203(1), a "short form," for the following projects, among others not pertinent to this proceeding:

(a) Projects not exceeding 10,000 cubic yards of material placed in or removed from the waters of the state. . . .

Pursuant to Rule 17-12.060, Florida Administrative Code, short form applications are to be filed with the appropriate Department

district office and are to be processed by that office. If a short form application cannot be filed, the application must be filed with the Bureau of Permitting in Tallahassee. Rule 17-12.090(1), Florida Administrative Code.

Within 30 days after receipt of an application, the Department is required to examine the application, notify the applicant of any apparent errors or omissions and request any additional information. Rule 17-12.060(5), Florida Administrative Code. Additional information which *may* be requested includes a hydrographic study demonstrating the flow of water and which predicts the effect of the proposed project on the flow of water, erosion or shoaling and water quality and water resources.

In this case, the Navy filed its application on a short form. The Petitioners argued that the Navy should not have been allowed to file a short form because the proposed project *and the existing breakwater* involve more than 10,000 cubic yards of material. The Petitioners have misread the requirements of the Department's rules. Rule 17-12.090, Florida Administrative Code, allows the use of a short form application unless the *project* involves 10,000 cubic yards of material *to be placed in the waters* of the state. The project in this case is an 850-foot extension of a breakwater that has been in existence since 1966. The *project* does not include the material of the existing breakwater as argued by the Petitioners. The project involved in this case only involves the placement in the waters of the state of the material necessary to build the 850-foot extension. The material which makes up the existing breakwater will not be placed in the waters as a result of this project.

The Petitioners also argued that a short form application was not proper because of Rule 17-4.290, Florida Administrative Code. That Rule has no application to this proceeding. That rule only applies to completed applcations received by the Department prior to October 1, 1984. The application filed by the Navy in this proceeding was not filed prior to October 1, 1984.

Based on the foregoing, it is concluded that the Navy has properly filed its application for the extension of the breakwater at Magazine Point.

The Petitioners also argued that the Navy's application should be rejected because it included an incorrect identification of the location of the proposed project. While it is true that the Longitude and Latitude of the proposed project in the Navy's application were incorrect, the application otherwise properly identified the correct location of the

241

proposed project. Additionally, the correct coordinates of the proposed project were presented at the final hearing.

Finally, in addition to the Petitioners' arguments concerning the substance of the dredge and fill permit applied for, the Petitioners argued that the hydrographics study requested by the Department and submitted by the Navy was inadequate. Although evidence was presented at the formal hearing indicating that hydrographic studies can include numerous sampling stations collecting data over a significant period of time, the evidence failed to prove that such a thorough study was necessary in this case or that the study actually conducted was not adequate.

The evidence in this proceeding proved that the Navy provided the Department with reasonable assurances that the proposed extension of the breakwater will not violated the water quality standards of Rule 17-3.121, Florida Administrtive Code, and that the proposed extension is not contrary to the public interest. The proposed project will not affect circulation patterns in Pensacola Bay or Bayou Grande or introduce any pollutants into the water. Based upon a balanced consideration of the criteria of Section 403.918(2), Florida Statutes (1985), it is also concluded:

1. The project will not adversely affect the public health, safety, or welfare or the property of others.

2. The project will not adversely affect the conservations of fish and wildlife at the project site or in Pensacola Bay or Bayou Grande. There are no endangered or threatened species which will be affected by the project.

3. The project will not adversely affect navigation or the flow of water or cause harmful erosion or shoaling. The project will benefit navigation and prevent shoaling in the channel located next to the breakwater.

4. The project will not adversely affect fishing or recreational values or marine productivity in the vicinity of the project.

5. The project is permanent.

6. There are no significant historical or archaeological resources which will be affected by the project.

7. The project will improve the current conditions of the area affected by the project because it will reduce the need to dredge the existing channel.

The Petitioners failed to meet their burden of proving that the Navy

has failed to comply with the requirements of Chapter 403, Florida Statutes. Essentially, the Petitioners presented evidence concerning seagrasses in Bayou Grande, the decrease in fish and other marine life in Bayou Grande and boating safety around the existing breakwater.

As to the safety around the existing breakwater, the Petitioners failed to prove that the breakwater in and of itself poses any threat to navigation. More importantly, the Petitioners failed to prove that the proposed extension of the breakwater will impose any safety problems.

The Petitioners' evidence concerning seagrasses, fish and marine life in Bayou Grande essentially amounts to speculation that the existing breakwater, dredging in the channel next to the breakwater and/or the proposed project have had or will have some adverse affect. The Petitioners, however, failed to prove any causal connection between the adverse consequences to seagrasses, fish and marine life experienced in Bayou Grande and the existing breakwater, the channel or the proposed extension of the breakwater.

Finally, the Petitioners attempted to prove that the combined effect of the project and an approved expansion of the Navy's marina in Bayou Grande will adversely affect water quality standards and the public interest. The evidence failed to prove that the two projects, when considered together, will adversely affect water quality standards or the public interest.

## RECOMMENDATION

Based upon the foregoing Findings of Fact and Conclusions of Law, it is

RECOMMENDED that the Department issue to the Navy the dredge and fill permit applied for by the Navy pursuant to application number 17 1054501.

DONE and ENTERED this 19th day of August, 1987, in Tallahassee, Florida.